1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10
11

| OSCAR MORALES, | No. 2: 12-cv-0544 TLN KJN P |
|---|---|
| Petitioner, | ORDER and |
| v. | FINDINGS & RECOMMENDATIONS |
| STU SHERMAN, et al., | |
| Respondents. | |

12
13
14
15
16
17

Introduction

18    Petitioner is a state prisoner, proceeding with counsel, with a petition for writ of habeas

19 corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2009 conviction for attempted

20 murder and assault with a firearm, personal use and discharge of a firearm, and infliction of great

21 bodily injury. Petitioner is serving a sentence of 32 years to life.

22    This action is proceeding on the amended petition filed August 22, 2012. (ECF No. 17.)

23 The amended petition contains four claims: 1) the trial court erred by excluding evidence of third

24 party culpability; 2) Brady error; 3) ineffective assistance of trial counsel; and 4) ineffective

25 assistance of appellate counsel. (Id.)

26    On November 17, 2013, respondent filed a motion to dismiss on the grounds that this

27 action is barred by the statute of limitations. (ECF No. 17.) On June 17, 2013, the undersigned

28 recommended that respondent's motion be granted. (ECF No. 31.)

1    On September 17, 2013, the Honorable Lawrence K. Karlton issued an order adopting the
2    June 17, 2013 findings and recommendations in part.  (ECF No. 34.)  Judge Karlton found that
3    claim one was not barred by the statute of limitations and denied respondent's motion to dismiss
4    this claim.  (Id.)  As for the remaining three claims, Judge Karlton granted the motion to dismiss
5    without prejudice to petitioner's right to seek reconsideration as set forth in the order.  (Id.)  In
6    particular, Judge Karlton referred this action to the Office of the Federal Defender for the purpose
7    of determining whether evidence existed to support a claim of actual innocence which would
8    overcome the statute of limitations bar.  (Id.)

9    On June 6, 2014, petitioner filed a motion for an evidentiary hearing in support of his
10   claim for actual innocence and a motion for witness immunity.  (ECF Nos. 45, 46.)  Petitioner
11   moves for an evidentiary hearing as to his untimely ineffective assistance of counsel claim and his
12   related claim of actual innocence.  In the amended petition, petitioner alleges that trial counsel
13   was ineffective for failing to conduct certain pretrial investigation.  (ECF No. 17 at 5.)  Petitioner
14   alleges that trial counsel failed to investigate the 911 call that was made after the shooting.  (Id. at
15   8.)  The 911 caller described the shooter as Black.  (Id. at 7.)  Petitioner is Hispanic.  (Id.)
16   Petitioner argues that trial counsel's failure to investigate the 911 call deprived him of a third-
17   party defense.  (Id. at 5.)

18   Also pending is petitioner's motion for witness immunity (ECF No. 46), filed in support
19   of his motion for an evidentiary hearing.

20   On November 20, 2014, a hearing was held regarding petitioner's pending motions.
21   David Porter and Heather Williams appeared on behalf of petitioner.  Galen Farris appeared on
22   behalf of respondent.  After carefully considering the record, the undersigned recommends that
23   petitioner's motion for an evidentiary hearing and motion for witness immunity be denied.[1]

24   Good cause appearing, petitioner's motion for a one day extension of time to file his reply
25   brief (ECF No. 66) is granted.

26

---

27   [1]  The undersigned is troubled by petitioner's age when he committed the offenses (15 years old)
     and his lengthy sentence (32 years to life).  However, these circumstances may not be considered
28   in evaluating the pending motions or the merits of petitioner's actual innocence claim.

2

1    Factual Background

2           The opinion of the California Court of Appeal contains a factual summary.  After

3    independently reviewing the record, the undersigned finds this summary to be accurate and

4    adopts it herein:

5                  BACKGROUND

6                  The People's case was straightforward: The victim had had a long-
                   running feud with the Morales family, and eventually defendant, a
7                  younger son in that family, shot the victim. The defense theory was
                   that the victim was drunk and could not identify the person who
8                  shot him, but used the occasion of being shot to blame defendant, as
                   part of that family feud. The only evidence that defendant was the
9                  shooter came from the victim's statements and testimony, although
                   the victim's daughter made a statement corroborating defendant's
10                 presence on the occasion of the shooting.

11                 The victim testified he knew defendant, in part because defendant's
                   older brother Steven had had an affair with the victim's ex-wife,
12                 which caused the victim and his ex-wife to divorce. This affair had
                   made the victim angry, and after the victim made criminal threats
13                 against his wife, which he claimed were unrelated to the affair, she
                   obtained a restraining order, and their children went to live with the
14                 Morales family for several months.

15                 After the victim and his ex-wife reconciled for a time, Steven
                   Morales ran them off the road with his car, with the aid of his
16                 brother, Johnnie Morales, as a result of which Steven Morales was
                   sent to prison. The victim's stepdaughter had had children with
17                 Hector Morales, another brother of defendant, and the victim
                   disapproved of this relationship. The victim testified that about four
18                 or five years prior, he got into a fistfight with several members of
                   the Morales family, but not with defendant, and that Steven
19                 Morales "shot at me that day twice." The victim testified he was
                   "still feuding to this day" with the Morales family.
20
                   On the evening of January 25, 2006, the victim was on his porch,
21                 drinking with friends, when defendant, a "Hispanic," arrived with a
                   group of about six or seven Black male teenagers. After words were
22                 exchanged and the victim threatened to sic his dog on them, the
                   group left. However, defendant threatened to come back in 20
23                 minutes and shoot the victim. The victim called his ex-wife and told
                   her defendant had threatened to shoot him and said, "If anything
24                 happens to me, make sure my family gets justice." Later, defendant
                   returned and called out to the victim. The victim saw defendant had
25                 his hands through the fence, holding something. The victim turned
                   away, and was shot in the back.
26
                   The victim testified that in the exchange of words he had with
27                 defendant prior to the shooting, he referred to defendant's brother
                   Steven as defendant's "sister." He also testified that when he first
28                 saw the group of teenagers, with one Hispanic standing alone, he

                                           3

called out that he knew "that's not Morales," but he did not mean he knew it was not defendant, he meant if that person was a Morales family member, there would "be some problems right there[.]"

The victim told the first officer on the scene that defendant was the shooter, and the next day the victim identified defendant from a photographic lineup. The victim described defendant to the officer as a "male Hispanic, 14 to 15 years old, 120 pounds, wearing all black clothing." The victim also gave this officer a fuller statement at the hospital, identifying defendant as the shooter and stating that defendant, in the company of about five male Black juveniles, had threatened to shoot him about 20 minutes earlier.

The victim testified he had had about two 40-ounce malt liquors that evening, starting about 7:00 p.m. and ending when he was shot about two hours later, but he later conceded, "It's been so long. Might have been the fourth one, might have been the fifth one. I don't know. I wasn't counting them." A doctor noted in the hospital records that the victim was intoxicated.

The victim had seen one of the Black "kids" before: That youth had been bothering Robert, one of the victim's drinking companions, and was a "troublemaker in the neighborhood." On Thanksgiving 2006, after the shooting, the victim was visiting Robert, when defendant's brother Johnnie and his family pelted the victim's car with beer bottles and "[t]hey was kicking the doors, trying to pull us out, scratching, screaming, hollering, all kind of stuff."

The victim's daughter testified she saw her father arguing with a group of teenagers consisting of Blacks and one "Mexican." She heard one teenager say, "[W]e're coming back with a nine millimeter." She had not identified any of the teenagers as defendant, whom she knew, but her father told her defendant was the one who threatened him. In part, her 911 call transcript reads "my dad was arguing with some black guys. And they said that they were gonna bring a .9mm and come and shoot him." She testified she said this because most members of the group were Black. A peace officer testified that on the night of the shooting, the victim's daughter identified defendant as the lone Hispanic in the group.

Defendant did not testify at trial.

People v. Morales, 2010 WL 3245400 at *1-2 (2010).

Legal Standard for an Evidentiary Hearing

In assessing whether an evidentiary hearing is warranted, the court considers whether such a hearing "would produce evidence more reliable or more probative" with regard to petitioner's assertion of actual innocence than the declarations before the court. Griffin v. Johnson, 350 F.3d 956, 966 (9th Cir. 2003).

4

1 | Legal Standard for Actual Innocence

2 |     The Supreme Court has found that a federal court may entertain an untimely claim if a

3 | petitioner makes a showing of actual innocence:

> Actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, ..., or as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." <u>Schlup</u>, 513 U.S., at 329, 115 S.Ct. 851.

9 | <u>McQuiggin v. Perkins</u>, 133 S.Ct. 1924, 1928 (2013).

10 |     A petitioner must support his claim of actual innocence "with new *reliable* evidence—

11 | whether it be exculpatory scientific evidence, *trustworthy* eyewitness accounts, or critical

12 | physical evidence—that was not presented at trial." <u>Schlup v. Delo</u>, 513 U.S. 298, 324 (1995)

13 | (emphasis added). The evidence need not be newly discovered, but it must be "newly presented."

14 | <u>See</u> <u>Griffin v. Johnson</u>, 350 F.3d 956, 961–63 (9th Cir. 2003). He must "show that it is more

15 | likely than not that no reasonable juror would have convicted him in light of the new evidence."

16 | <u>Schlup</u>, 513 U.S. at 327.

17 |     In its inquiry, the reviewing habeas court "consider[s] all the evidence, old and new,

18 | incriminating and exculpatory, admissible at trial or not." <u>House v. Bell</u>, 547 U.S. 518, 538

19 | (2006) (internal quotation marks omitted). And on this complete record, the court makes a

20 | "'probabilistic determination about what reasonable, properly-instructed jurors would do.'" <u>Id.</u>

21 | (quoting <u>Schlup</u>, 513 U.S. at 329).

22 |     "Unexplained delay in presenting new evidence bears on the determination whether the

23 | petitioner has made the requisite showing." <u>McQuiggin</u>, 133 S.Ct. at 1935. An eleventh hour

24 | affidavit from a fellow inmate, friend or relative of the accused has limited probative value in

25 | considering actual innocence. <u>House</u>, 547 U.S. at 552. In other words, new affidavits are not

26 | simply accepted at face value. <u>Smith v. Baldwin</u>, 510 F.3d 1127, 1142 (9th Cir. 2007) (en banc).

27 | ////

28 | ////

5

Petitioner's Declarations

In the motion for an evidentiary hearing, petitioner argues that the declarations set forth herein undermine the confidence in the outcome of petitioner's trial because they directly impeach Troy Herman's statements and testimony, which was the only evidence that petitioner was the shooter. Petitioner seeks to call these three declarants and petitioner as witnesses at an evidentiary hearing. The undersigned sets forth these declarations herein.

In his declaration, petitioner states as follows:

> 1. I am the defendant in the above case and the Petitioner in this case. If called as a witness, I am competent to testify to the information set forth in this declaration.
>
> 2. All matters here I would have testified to at my trial except my lawyer Jo Ann Harris said for me not to testify even though I wanted to, and I would testify the same to them now.
>
> 3. When Troy Herman, the victim in the case against me, was shot on January 25, 2006, I was 15 years old (born December 1990) and there was a probation violation warrant out for my arrest. Because I knew the warrant was out, I did not want to be out after dark because I thought it was more likely I would get stopped and arrested.
>
> 4. In the afternoon of January 25, I was hanging out with my cousin, Marquis McAfee, and Jaronn Lee, both a few years older than me, and 2 other teenagers, one my age (I think his name is Jeffrey Fulmer) and the other a year or two younger than me. All the others are African-America; I am Hispanic. Marquis and Jaronn were both on the football team at Kennedy High School. I was wearing a black hoodie and was not much shorter than I am now. It was rainy on that afternoon.
>
> 5. In the afternoon, Marquis and I walked to the mother of Jaron's baby's house by Yreka Avenue. We connected up with the two other teens and were walking south on Woodbine Avenue planning to go to a fast food restaurant, like a Kentucky Fried Chicken, on Florin Road. As we crossed Yreka Avenue and walked by a wrought iron fence, I was walking in the street, almost to the other side of the street. Three men came out from the house right on the southeast corner, talking "trash." They seemed to know the boy I think was Jeffrey Fulmer and said something like a troublemaker about him. One of the men said something about touching his fence – we weren't touching his fence. Then the man I later found out was Troy Herman asked where my "little sister" was. Though I have sisters, it didn't make sense and realized he was talking about my brother Steven, and this was Troy Herman talking. My brother, Steven, and Troy's wife, Tereza, had an affair which caused Troy's and Tereza's divorce. Then Troy went to the gate and acted like he was going to let his dogs out, and we all started running east on

6

Yreka towards the light rail station.

6.  That afternoon, I never said anything about a gun and never saw anyone I was with have a gun that day.

7.  We took the light rail from the Florin Station to downtown by the K Street Mall.  We went wandering around.  Marquis called his then-girlfriend, Janay, and she was there at the Mall to take us home in her grey Toyota Rav4 –I was in the back seat with all the other guys except Marquis who was in the passenger seat.  Janay took me to my mom's at Willowick and Florin Road/Meadowview area, by Goethe Middle School.  I stayed at my mom's for a while, then, my brother Steven's girlfriend Desiree, came to get me to take me where I was staying with her, Steven, and their baby in West Sacramento.

8.  As Desiree was driving me from my mom's house to where we were living, just as we got onto I-5, my mom called me on my cell phone to let me know the police had just been there and were looking for me about some shooting.  After we hung up, I called Marquis on my cell phone and asked him if he knew what was going on.  He said he had gone back to that area later and "Don't worry about it."  I asked what he meant.  He said something like, "I took care of it and I smacked him.  Don't worry.  You'll beat it."  I told him he needed to tell the truth whatever happened.  That was the last time I ever talked with Marquis.

9.  I was arrested in March 2006, about a month and a half later.

10.  At no time during the events I describe here or that day did I say I was going to shoot anyone; I didn't have any gun and I didn't shoot anyone.

(ECF No. 45 at 30-33.)

In his declaration, Robert Byrd states,

2.  I know Troy Herman [the victim].  I have known him for a long time.

3.  On the day Troy was shot, in January 2006, I was with Troy.  I stopped by his house at 7035 on Woodbine Avenue with my nephew, Paul Thomas, around 3:00 p.m. and started to drink with Troy.

4.  Around 5:00 p.m., I remember a group of kids went by Troy's house.  One of the kids said something to Troy.  I do not recall which kid spoke or what he said. There were a total of three kids.  I think the kids might have been all African-American or Mexican. The group of kids had issues with Troy.  I think the whole group had issues with Troy, not just one person in the group.  I do not remember if any of the kids in the group used Troy's name.

////

7

5. One of the kids told Troy he would come back and shoot Troy's ass. I do not know which kid said that to Troy. I do not know any of the kids. I have not seen any of the kids around this neighborhood. Their argument lasted a few minutes. The kids then continued walking down Yreka Avenue. The kids did not run away; they walked away.

6. Two hours later Troy was shot. It was dark when Troy was shot. I am not sure if it was raining when Troy was shot.

7. Troy was standing by the pole on the front porch. Attachment C # 1. Troy was leaning against the pole with his right shoulder. Troy's back was to Yreka Avenue. Troy was holding a beer in his hand before he was shot.

8. There was no warning before Troy was shot in the back. I did not see Troy look over his shoulder. I did not see Troy move his head. Troy was talking to both Paul and I before he was shot. I did not hear Troy's name being called before Troy was shot; Troy was just shot.

9. The shot came from the fence area on Yreka Avenue. Attachment C, # 2. I knew it came from that area because that's where the sound of the shot came from. Paul and I then went out to the corner of Woodbine and Yreka Avenues and looked down the street. I did not see the shooter. Whoever shot Troy was gone by the time I looked down Yreka.

10. I have not spoken to Troy about what happened that night. I only spoke [sic] him one time I think. He did not tell me much. I do not think Troy wants to relive that night.

11. I drank about six 40 ounce beers that day. I was drunk when the shot was fired. Troy drank about six to seven 12 ounce beers that night. I am not sure how much Paul drank that night.

(Id. at 22-23.)

In his declaration, Paul Thomas states,

2. I do not know Troy Herman. My uncle, Robert Byrd, is friends with Troy. Robert was with Troy the night Troy was shot, around January 2006.

3. I was at Robert's house around noon the day Troy was shot. Around 3:00 p.m., Robert and I went to Troy's house. I am not sure where Troy lives. Troy lives near my uncle. My uncle lives on 27th St in South Sacramento.

4. Around 5:00 p.m., 4 to 5 kids were walking down the street. One of the kids said something to Troy about Troy's sister. Troy told the kids to get lost. This lasted only a few minutes. I think the kids were African-American.

////

8

5.  I do not remember if any of the kids said something to Troy as they walked away.  The kids did not run away after the one kid talked with Troy; the kids walked away.

6.  Around 30 to 60 minutes later, one of the kids came back and shot Troy.

7.  Troy was about to sit down on the porch railing when he was shot.  Troy's back was to Yreka Avenue when he was shot about to sit down on the railing.  Attachment B, # 1.  Troy was shot in the back.  I was sitting on the porch next to Troy.  Attachment B, # 2.  Troy was to my left.

8.  I did not hear any warning.  I did not hear Troy's name being called out before he was shot.  I did not see Troy look over his shoulder before he was shot.  Troy was just about to sit on the rail when he was shot.

9.   After the shot, I then ran inside and told Troy's daughter, Sabrina, to call 911.  I was on parole and I was not supposed to drink, so I took off.  I was caught by the police on Woodbine a few blocks from Troy's house.

10.  I did not see the shooter.  Before I left, I did try to see which direction the shooter ran, but I did not see anyone running away.

11.  I have not spoken to Troy about that night.  Troy is friends with my uncle, not me.

(Id. at 26-27.)

In his declaration, Jerome Day states,

2.   On January 25, 2006, the day Troy Herman was shot, I was living at 7044 Woodbine Ave, Sacramento, California, 95822.

3.   I know Troy Herman.  Troy was my neighbor and friend in January 2006.  We lived across the street from each other.

4.   I was at Troy's house at 7035 Woodbine Avenue when he was shot in the back.

5.   I was drinking with Troy for about 90 minutes before Troy was shot.  During those 90 minutes, Troy told me about an argument he had with some kids.  Troy told me the argument happened three to four hours before I showed up.  Troy told me that one of the kids he had a problem with earlier that day said he would come back and shoot Troy.  I am not sure if he told me which person in that group said that to him.  He probably did tell me but I cannot remember.

6. I was standing in front of Troy when he was shot.  I was standing on the lawn.  Attachment A, # 1.  Troy was leaning against a pole on the front porch.  Attachment A, # 2.  Troy's back was to Yreka before he was shot.  My back was to Woodbine Avenue.

9

7.  Before Troy got shot, I remember hearing something.  I do not recall what was said.

8.  I do not recall if Troy's name was said before Troy was shot.

9.  I do not recall if Troy looked over his shoulder towards Yreka before Troy was shot.

10.  Now, eight years later, I am not sure who shot Troy.  The information I gave to the police dispatcher right after Troy was shot could be correct.  I called 911 right after Troy was shot.  I told the dispatcher the shooter was African-American.  I know the person was not white.  I told the dispatcher the person was African-American because the area by where I think the shot came from was dark.  Attachment A, # 3.  I only saw the shooter from the corner of my eye.

11.  Before I called the dispatcher, I ran out to the corner of Yreka and Woodbine and I looked east down Yreka.  The person who shot Troy ran down that street.  By the time I was at the corner, the person I believe shot Troy was 500 feet away and I could not see any more where that individual was running.  Yreka Avenue was very dark.

12.  I recognize my voice on the recording you played.  The recording is of me calling the police dispatcher the night that Troy was shot in the back.

***

14.  I drank about two to three 40 ounce beers in the 90 minutes before Troy was shot.  I did not keep tabs on how much Troy was drinking.

15.  Troy had another friend over that night.  I do not know who that friend was.

(ECF No. 60-1 at 1-2.)

Relevant Trial Testimony

In order to put petitioner's declarations in context, the undersigned sets forth the following relevant trial testimony.

The victim, Troy Herman, testified that on January 25, 2006 at approximately 8:45 to 9:00 p.m., he was sitting on his front porch with his friends, Robert and Paul.  (RT at 90.)  At around that time, he saw the group of six or seven teenagers walking toward his house.  (Id. at 92-93.) One of the teenagers was Hispanic and the rest were Black.  (Id. at 93.)  Petitioner later identified the Hispanic teenager as petitioner.  (Id. at 100.)  Petitioner and Herman started arguing.  (Id. at

10

103.)  When petitioner ran away, petitioner shouted, "I'm going to come back and shoot you in twenty minutes." (Id. at 108, 112.)  The group of teenagers ran toward the light rail station.  (Id. at 109.)  Five minutes after the teenagers left, petitioner called his ex-wife, Tereza, who had been married to petitioner's brother.  (Id. at 109, 113.)  Herman told her that petitioner had threatened to come back and shoot him in twenty minutes.  (Id. at 111.)  Herman then went back to the porch.  (Id. at 113.)  Herman's friend Jerry had joined the group.  (Id. at 114.)

Herman later heard petitioner call out his name.  (Id. at 118.)  When Herman heard the voice, Herman was standing on the corner of his porch, facing Woodbine.  (Id.)  Herman heard the voice coming from the right.  (Id.)  Herman looked over his shoulder toward the voice then turned back to get away.  (Id. at 119.)  Herman saw petitioner at the corner of the fence line.  (Id. at 119-20.)  Herman heard a loud noise and was shot.  (Id. at 123.)  Herman testified that the shooting occurred between 30 and 40 minutes after the first incident.  (Id. at 220.)

Sabrina Herman, Herman's daughter, testified that around 9:00 p.m. on the night of the shooting, she was with a friend who lived next door to Herman.  (Id. at 268.)  Sabrina was sitting in a car parked in the driveway.  (Id. at 269.)  She heard Herman arguing with other people.  (Id. at 270.)  Sabrina looked over her shoulder to see the people arguing and saw "I think like ten people" near Herman's house.  (Id. at 271.)  Sabrina testified that the group was probably teenagers.  (Id. at 272.)  One of the teenagers was Hispanic and the rest were Black.  (Id.)  She heard one of the teenagers say that they were coming back with a nine millimeter.  (Id. at 275.)

After the group of teenagers left, Sabrina went to Herman's house.  (Id.)  Herman told Sabrina that Oscar Morales had just threatened his life then he went back outside.  (Id. at 275-76.)  Sabrina called her mother, Tereza Nieves (petitioner's ex-wife), who told Sabrina to go inside.  (Id. at 275.)  Sabrina then heard gunshots.  (Id. at 276.)  Sabrina testified that approximately ten minutes passed between the time she went back into the house after returning from visiting her friend until she heard the gunshot.  (Id. at 277.)  Sabrina then called 911.  (Id. at 279.)

The 911 dispatcher asked Sabrina who did it. (Id. at 281.)  Sabrina responded that her dad was arguing with some black guys.  (Id.)  At trial, Sabrina testified that she said did not mention the Hispanic teenager to the dispatcher because the majority of the group was Black and she was

1    shaken up.  (Id. at 282.)

2         Herman's ex-wife, Tereza Nieves, testified that on the night of the shooting, she received

3    a call from Herman in which he told her that petitioner had threatened his life.  (Id. at 378.)

4    Herman told Nieves that petitioner said he had a nine millimeter for him.  (Id. at 402.)  Later,

5    Nieves received a telephone call from her daughter, Sabrina.  (Id. at 380.)  Nieves testified that

6    Sabrina told her that Herman had been arguing with kids outside and one of them was petitioner.

7    (Id. at 381.)  Nieves testified that Sabrina called her again about fifteen minutes later.  (Id. at

8    382.)  In the second phone conversation, Sabrina told Nieves that Herman had been shot.  (Id.)

9         Sacramento Police Officer Davis testified that he spoke with Sabrina Herman at about

10   9:50 p.m. on the night of the shooting.  (Id. at 452.)  She told Officer Davis that as she was sitting

11   in the car next door to her dad's house, she saw a group of about ten teenagers arguing with her

12   dad.  (Id. at 452-54.)  Sabrina Herman told Officer Davis that there were nine Black teenagers and

13   one Hispanic teenager.  (Id. at 454.)  Sabrina Herman told Officer Davis that the Hispanic

14   teenager was petitioner.  (Id. at 454-55.)

15        Sacramento Police Officer Gunter testified that he personally heard the shooting at 9:30

16   p.m.  (Id. at 513.)

17   Newly Presented Evidence

18        In the opposition to petitioner's motion for an evidentiary hearing, respondent argues that

19   the statements in the declarations set forth above do not qualify as "new evidence" under the

20   actual innocence exception.  Respondent argues that only evidence that was either wrongly

21   excluded at trial or became available after the trial completed qualifies as new evidence under the

22   actual innocence exception.  Respondent argues that the information in the declarations set forth

23   above was available before trial.  The undersigned addresses this argument herein.

24        Respondent argues that the declarations of Robert Byrd, Jermone Day and Paul Thomas

25   are not "new evidence" because trial counsel was aware that they were witnesses to the shooting

26   prior to trial.  Respondent cites trial counsel's motion for bail, filed May 2, 2006, where she cites

27   the statements given by Byrd, Day and Thomas to the police.  (Respondent's Lodged Document

28   10 at 48-50.)  The motion for bail gives a synopsis of the statements by Byrd, Day and Thomas:

Statement of Robert Byrd to Police

Mr. Herman, Paul, and Mr. Byrd had an argument with about five to six males with *medium complexion, possibly black teenagers* [emphasis in original], about one hour before the shooting occurred. The reason why Mr. Herman, Paul and Mr. Byrd got into an argument with them was because they were disrespecting an older lady up the street.

"We confronted them in the middle of the street, and they started doing all kinds of gang signs at us." Mr. Byrd had no idea what the symbol meant and does not remember the signs they displayed. About an hour later, Mr. Byrd saw "the flare" of a gunshot and saw that Mr. Herman was shot.  "*I didn't see the shooter* [emphasis in original] and can't identify any of the kids if I saw them again today."

Statement of Jermone Day to Police

January 25, 2006

Mr. Day was standing outside with Mr. Herman, having some beers when a shot from a gun went off.  Mr. Day only saw it from the corner of his eye, and saw that it was "*a dark complected and dark clothed man."* [Emphasis in original.]  "The man" ran eastbound on Yreka from Woodbine.  Mr. Day did not get a good look at him and would not be able to identify him, if Mr. Day saw him again. The reason Mr. Day was out drinking [in] Mr. Herman's yard because "he" had a conflict with someone earlier in the day and "they" told Mr. Herman that "they" would come back with guns. Mr. Herman just said that he had "had problems with some Mexican kids."  Mr. Herman did not tell Mr. Day the details of the problems.

Statement of Paul Thomas to Police

January 25, 2006

Sacramento Police Officer Mr. Young, badge 0521 interviewed Mr. Thomas.  Officer Young stated that Thomas had been drinking and Thomas' statement "was general and vague."

Mr. Thomas was at the shooting scene when the shooting occurred. About thirty minutes before police interviewed Mr. Thomas, he was sitting on the front porch of Mr. Herman's home.  "[Mr. Thomas] had been drinking beer for a while."  "About six, what appeared to be *black juveniles* [emphasis in original], were in front of the house. They were talking a bunch of trash to Troy.  They were saying something about someone's girlfriend or something. Troy was yelling back at them.  He said something like, 'Well, what are you going to do?'  One of the kids, I'm not sure which one, said something about a gun.  They all took off walking [eastbound] on Yreka."  About twenty to thirty minutes later, while Mr. Thomas "was still hanging out on the porch," Mr. Thomas heard a gunshot. *Mr. Thomas did not see who shot or where it came from* [emphasis

in original], but Mr. Herman fell down on the ground.  Mr. Thomas could tell Mr. Herman had been shot.  Mr. Thomas stayed a little while and then left, because he is a wanted parolee.

(Respondent's Lodged Document 10 at 48-50.)

Respondent also cites the preliminary hearing transcript where defense counsel attempted to cross-examine Sacramento Police Officer Michael Gunter about his contact at the scene with a few individual who were present, although neither Byrd, Thomas or Day are identified by name. (Id. at 76-78, 83, 87, 95.)  Respondent also observes that Robert Byrd was listed on the prosecutor's witness recognition forms dated September 14, 2006, August 14, 2008, September 8, 2008, October 22, 2008 and November 5, 2008.  (Id. at 147, 157, 160, 161, 469.)  Paul Thomas was listed on the prosecutor's witness recognition forms dated October 8, 2008, October 22, 2008, November 5, 2008, and November 17, 2008   (Id. at 158, 160, 161, 179.)

In Griffin v. Johnson, 350 F.3d 956 (9th Cir. 2003), Justice Wallace addressed whether "newly discovered" or "newly presented" evidence qualifies as new evidence under the actual innocence exception to procedural default.   350 F.3d at 961-63.  Justice Wallace concluded that "habeas petitioners may pass Schlup's test by offering 'newly presented' evidence of actual innocence." 340 F.3d at 963.

Respondent argues that cases decided after Griffin "confirm the view" that evidence submitted in support of a showing of actual innocence must either have been wrongly excluded at trial or became available only after trial, i.e., newly discovered rather than newly presented.  In support of this argument, respondent cites McQuiggin v. Perkins, 133 S.Ct. 1924 (2013), Lee v. Lampert, 653 F.3d 929 (9th Cir. 2011), James v. Ratman, 2013 WL 5840278 at * 8 (C.D. Cal. Oct. 28, 2013), and Chestang v. Sisto, 522 Fed.Appx. 389 (9th Cir. 2013).

At the outset, the undersigned finds that Perkins did not address or resolve the issue of whether "newly discovered" versus "newly presented" evidence qualifies under the actual innocence exception.  As will be discussed in more detail herein, in Lee v. Lampert, the Ninth Circuit also did not address this issue.

In Chestang v. Sisto, the Ninth Circuit found, in relevant part, that a declaration did not constitute "new evidence" of actual innocence:

14

1

2

3

4

5

6

7

8

> And while Mann's declaration may have been new as of 2004, it concerns events that took place in 1993 and that were within Chestang's knowledge. That is, if Mann, not Chestang, shot the victims, Chestang knew that fact on the night of the murders. He nonetheless told his friends he was the shooter, turned himself in, pleaded guilty, and served ten years of his prison sentence before asserting that Mann was the shooter. See Perkins, 133 S.Ct. at 1935 ("Unexplained delays in presenting new evidence bears on the determination whether the petitioner has made the requisite showing.") Assessing "how reasonable [factfinders] would react to the overall, newly supplemental record," Lee, 653 F.3d at 929, it is not more likely than not that the trial court would have rejected Chestang's guilty plea or that, had Chestang gone to trial, every juror would have reasonable doubt that Chestang was guilty.

9

522 Fed.Appx. 389 at * 391.

10

11

12

In Chestang, the Ninth Circuit did not explicitly find that the at-issue declaration was not new evidence because the information was not discovered until after the trial. Instead, the Ninth Circuit found that the petitioner's delay in presenting the declaration rendered it unreliable.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

The undersigned has also reviewed James v. Ratman, 2013 WL 5840278 (C.D. Cal. 2013), where the district court found that the petitioner had not presented "new evidence" under the actual innocence exception. The district court in James v. Ratman acknowledged the Ninth Circuit's decision in Griffin, supra, noting that the issue before the Ninth Circuit in Griffin was whether the petitioner had presented new evidence sufficient to overcome procedural default rather than the statute of limitations. Ratman, at * 8. The district court stated that in Lee v. Lampert, 653 F.3d 929 (9th Cir. 2011) (en banc), the Ninth Circuit found that the actual innocence exception applies to claims barred by the statute of limitations. Id. The district court noted that Lee did not mention Griffin. Id. The district stated that the Lee decision was founded on the Supreme Court decision in Schlup, which applied the actual innocence exception to procedurally defaulted claims based on "evidence claimed to have been wrongly excluded or to have become available only after trial." Id., quoting Schlup, 513 U.S. at 328. In other words, the district court in James v. Ratman found that the Ninth Circuit in Lee applied the "newly discovered" evidence test, versus the "newly presented" evidence test, to cases alleging the actual innocence exception to time barred claims.

28

////

15

1    In Lee, the Ninth Circuit considered three pieces of "new" evidence:  1) an expert opinion

2    prepared after the trial; 2) a police report that was apparently available at the time of trial; and 3)

3    "other evidence" about a witness and another person related to the case.  653 F.3d at 943.

4    Regarding the police report, the one piece of "new evidence" available at the time of trial, the

5    Ninth Circuit stated, "Even assuming, arguendo, that the police report constituted 'new reliable

6    evidence ... that was not presented at trial,' Schlup, 513 U.S. at 324; Sistrunk, 292 F.3d at 673 n.4,

7    we must assess its likely impact on reasonable jurors in light of the complete record."  Id. at 945.

8    In Lee, the Ninth Circuit did not consider whether the "new" evidence was "newly

9    discovered" versus "newly presented," as it was not required.  Moreover, in the quote from Lee

10   above, the Ninth Circuit cited footnote 4 in Sistrunk v. Armenakis, 292 F.3d 669, 673 n.4 (9th

11   Cir. 2002), where the Ninth Circuit indicated that it followed the "newly presented" test:

> Sistrunk makes a preliminary argument that the district court
> improperly restricted the fundamental miscarriage exception by
> concluding that the "new evidence" necessary to support a claim of
> actual innocence under Schlup, 513 U.S. at 327, 115 S. Ct. 851,
> must be newly available, rather than just newly presented. In
> Schlup, the Court specifically stated that a claim of actual
> innocence requires the introduction of "new reliable evidence-
> whether it be exculpatory scientific evidence, trustworthy
> eyewitness accounts, or critical physical evidence-that was not
> presented at trial." Id. at 324, 115 S. Ct. 851. Sistrunk's evidence is
> all newly presented and, thus, may be considered in analyzing his
> Schlup claim. It is true that the magistrate judge stated that only
> newly-discovered evidence is properly submitted in support of a
> Schlup claim. A close review of the magistrate judge's order,
> however, discloses that the magistrate judge did, in fact, consider
> all of the evidence offered by Sistrunk. Moreover, any
> misapplication of the Schlup standard would not have affected the
> outcome of this case because, as we discuss below, Sistrunk's claim
> fails even considering all of the new evidence proffered.

22   292 F.3d at 673 n.4.

23   The undersigned is not persuaded by the District Court's decision in Ratman to disregard

24   Justice Wallace's discussion and ruling regarding this issue in Griffin.

25   Citing Griffin v. Johnson, 350 F.3d 956, 961-63 (9th Cir. 2003), in an unpublished case,

26   Walker v. McDaniel, 495 Fed.Appx. 796 (2012), the Ninth Circuit found that a letter sent to

27   defense counsel before trial constituted "new evidence" for purposes of the actual innocence

28   exception to the statute of limitations,

16

1

2   > Walker was convicted of the attempted murder of David Dimas. His
    > newly presented evidence is an affidavit from his cousin Johnny
3   > Walker, who actually shot Dimas. According to Johnny Walker's
    > affidavit, he sent Walker's attorney a letter before he and Walker
    > were tried. Johnny Walker avers that in his letter, he claimed sole
4   > responsibility for shooting Dimas. This letter was not introduced
    > into evidence, and Johnny Walker did not testify, at Walker's trial.
5   > Johnny Walker's affidavit is therefore "newly presented" evidence
    > for purposes of Schlup even though it may have been available at
6   > the time of Walker's trial. See Griffin v. Johnson, 350 F.3d 956,
    > 961–63 (9th Cir.2003).

7   Walker v. McDaniel, 495 Fed.Appx. 796 at *1 (9th Cir. 2012).

8       The Ninth Circuit's decision in Walker makes clear the intention of the Ninth Circuit to

9   consider "newly presented" evidence when applying the actual innocence exception to cases

10  involving time barred claims.

11      The undersigned is bound by the Ninth Circuit's decision in Griffin v. Johnson.  For the

12  reasons discussed above, the undersigned finds that the declarations by petitioner, Robert Byrd,

13  Paul Thomas and Jerome Day are newly presented evidence pursuant to the actual innocence

14  exception.  However, as noted above, a reviewing court does not automatically accept the newly

15  presented evidence.  Instead, the case law provides for a "sliding scale" in evaluating this

16  evidence, including consideration of such factors as delays in presenting the newly presented

17  evidence and giving limited consideration to eleventh hour affidavits from friends or family of the

18  accused.  See McQuiggin, 133 S. Ct. at 1935; House, 547 U.S. at 552.

19  Actual Innocence

20      *Byrd and Thomas Declarations*

21      The undersigned herein considers whether an evidentiary hearing would produce evidence

22  more reliable or more probative than the declarations by Byrd and Thomas.

23      Petitioner does not dispute that he was present with the group of teenagers who first went

24  to Herman's house.  The declarations submitted by petitioner in support of the pending motion

25  seek to undermine Herman's testimony that petitioner was the person who shot him.  Herman

26  was the only person to identify petitioner as the shooter.

27  ////

28  ////

17

1    The declarations submitted by Byrd and Thomas contradict Herman's trial testimony

2    regarding hearing petitioner call his name, turning to see petitioner, then being shot as he turned

3    to walk away.  In their declarations, both Byrd and Thomas state that they did not hear Herman's

4    name called before he was shot or see Herman look over his shoulder.

5    The problem with the Byrd and Thomas declarations, as noted by respondent, is that they

6    contain statements that are inconsistent with statements they made earlier to police as well as with

7    other evidence, which undermines their overall credibility.  In his 2006 statement to police,

8    summarized in the motion for bail, Byrd stated that the initial argument involved five to six

9    males.  In the declaration in support of the pending motion, Byrd now states that the initial

10   argument involved three males.  In 2006, Byrd told police that the shooting occurred about one

11   hour after the initial incident.  In his declaration, Byrd now states that the shooting occurred two

12   hours later.

13   Byrd's statement in his declaration that the initial incident occurred at 5:00 p.m. and the

14   shooting two hours later is also inconsistent with the credible evidence presented at trial.

15   Sacramento Police Officer Gunter testified that he personally heard the gunshot at 9:30 p.m.  (RT

16   at 513.)  Herman testified that the first incident occurred at between 8:45 and 9:00 p.m., and he

17   was shot 30 to 40 minutes later.  Sabrina Herman also testified that the first incident occurred at

18   around 9:00 p.m., and she heard the shooting not long after that.  Tereza Nieves testified that

19   approximately 15 minutes lapsed between the first call from her daughter and the second call

20   when her daughter reported that Herman had been shot.  The testimony of Officer Gunter,

21   Herman, Sabrina Herman and Tereza Nieves regarding the timing of the first incident and the

22   shooting is consistent and credible.

23   The statements in Thomas's declaration regarding the number of individuals who first

24   came to Herman's house (four to five) is somewhat different from the statement he gave to the

25   police in 2006 (six).  In his declaration, Thomas states that the first incident occurred at around

26   5:00 p.m., and the shooting 30 to 60 minutes later.  In his 2006 statement to the police, Thomas

27   did not state when the first incident occurred, but that the shooting occurred about 20 to 30

28   minutes later.  Thomas's approximation of events, i.e., the first incident occurred at 5:00 p.m. and

1    the shooting 20 to 60 minutes later, is inconsistent with the credible evidence regarding the timing

2    of events, as indicated above.

3         The undersigned also observes that Byrd's and Thomas's statements that the group of

4    teenagers walked away from Herman's house is inconsistent with Herman's testimony and

5    petitioner's statement in his declaration that the group of teenagers ran away.

6         Also, as noted by respondent, the credibility of both Byrd and Thomas is further

7    undermined by their intoxication on the night of the incident.  In his declaration, Byrd admits that

8    he was drunk when Herman was shot.  The officer who interviewed Thomas on the night of the

9    shooting stated that Thomas had been drinking and his statement was "general and vague."

10   While Herman had been drinking as well, as noted by respondent, the doctor who treated Herman

11   after the shooting testified that he showed no signs of disorientation or confusion.  (RT at 334.)

12   In addition, Officer Gunter interviewed Herman at the hospital at 10:15 p.m. on the night of the

13   shooting.  (Id. at 529.)  Officer Gunter testified that he had no difficulty in communicating with

14   Herman because of his consumption of alcohol.  (Id. at 535.)

15        For the reasons discussed above, the undersigned does not find that having Byrd and

16   Thomas testify at an evidentiary hearing would produce evidence more reliable or more probative

17   than their declarations.  There is no indication that Byrd's or Thomas's testimony at an

18   evidentiary hearing would be significantly different from the statements in their declarations.  The

19   undersigned need not hear the testimony of Byrd and Thomas at an evidentiary hearing in order to

20   evaluate the reliability and credibility of their statements.  For this reason, petitioner's motion to

21   call Byrd and Thomas as witnesses at an evidentiary hearing is denied.

22        Turning to the merits of petitioner's actual innocence claim, for the following reasons the

23   undersigned cannot find that it is more likely than not that no reasonable juror would have

24   convicted petitioner in the light of the statements in the Byrd and Thomas declarations.  First, for

25   the reasons discussed above, the Byrd and Thomas declarations have credibility problems.

26        Second, much of Herman's testimony regarding what happened before the shooting was

27   corroborated by other witnesses, including Byrd and Thomas.  It is undisputed that petitioner was

28   with the group of teenagers who first went to Herman's house.  Strong evidence was presented

1  that petitioner threatened to shoot petitioner during the first incident.  Herman testified that

2  petitioner threatened to come back and shoot him during this first incident.  In his declaration,

3  Byrd states that he heard one of the teenagers threaten to shoot Herman, although he could not

4  identify which one.  Sabrina Herman testified that she heard one of the teenagers threaten

5  petitioner.  Sabrina Herman testified that right after the first incident, Herman told her that

6  petitioner had threatened his life.  Tereza Nieves also testified that petitioner called her shortly

7  after the first incident and told her that petitioner had threatened his life.  In addition, petitioner

8  had a motive to shoot Herman, i.e., the family feud.

9         Taking into account Byrd's and Thomas's inconsistent statements, their intoxication,

10  Herman's consistent statements as well as the corroboration of his testimony regarding the other

11  events of the evening, and the evidence of petitioner's motive, the undersigned does not find that

12  it is more likely than not that no reasonable juror would have convicted petitioner had they heard

13  Byrd and Thomas testify.

14         The undersigned further notes that, as observed by respondent's counsel during oral

15  argument, the gravamen of petitioner's trial counsel's closing argument was to challenge

16  Herman's credibility on grounds that he was motivated to lie based on his feud with petitioner's

17  family:

18              Why are we here?  This case is about a shooting, but this story is
                about a love lost, betrayal, remorse and an effort to make amends.
19              This story is about two families torn apart.  This story is about a
                man whose heart was stricken with the grief because of the betrayal
20              of the marriage bed by his wife.

21  (RT at 760-61.)

22         After considering the evidence, the jury found Herman credible, rejecting the argument

23  and evidence that Herman was motivated to lie in revenge for his wife's betrayal.  The addition of

24  the statements in the Byrd and Thomas declarations to the evidence presented would not have

25  sufficiently undermined the credibility of Herman's testimony regarding hearing and seeing

26  petitioner just before he was shot so as to change the outcome.

27  ////

28  ////

20

*Day Declaration*

For the reasons discussed herein, the undersigned does not find that having Day testify at an evidentiary hearing would produce evidence more reliable or more probative than his declaration.   There is no indication that Day's testimony at an evidentiary hearing would be significantly different from his statements in his declaration.  The undersigned need not have Day testify at an evidentiary hearing in order to evaluate the reliability or credibility of his statements. In addition, for the reasons stated herein, the undersigned cannot find that it is more likely than not that no reasonable juror would have convicted petitioner in the light of the statements in the Day declaration.

Petitioner initially argued that his lawyer was ineffective for failing to investigate the 911 call where the caller identified the shooter as African American, thus preventing him from pursuing a third party defense.  In his declaration, Jerome Day states that he was the 911 caller. Jerome Day also that he is not sure who shot Herman.  His declaration indicates that while he knows the shooter was not white, he cannot say for sure that the shooter was black.  Because Day could not identify the race of the shooter, it is not more likely than not that a reasonable juror would have found petitioner not guilty had they heard Day's statement clarifying his statements in the 911 call.

The other statements in Day's declaration do not really add much to petitioner's actual innocence claim.  Day states that Herman told him that, during the first encounter, one of the teenagers threatened to come back and shoot him, corroborating Herman's testimony regarding the threat.  Day's statements regarding what happened just prior to the shooting are vague and do not undermine Herman's testimony.  Day stated that he heard "something" and does not recall whether Herman looked over his shoulder just before being shot.

For the reasons discussed above, petitioner's motion to call Day as a witness at an evidentiary hearing is denied.  In addition, as for the merits of petitioner's actual innocence claim, the undersigned does not find that it is more likely than not that no reasonable juror would have convicted petitioner in the light of the statements in the Day declaration.

////

21

1       *Petitioner's Declaration*

2              For the reasons discussed herein, the undersigned does not find that having petitioner

3       testify at an evidentiary hearing would produce evidence more reliable or more probative than his

4       declaration.  There is no indication that petitioner would offer additional information at an

5       evidentiary hearing.  The undersigned need not hear petitioner testify in order to evaluate his

6       credibility.  In addition, for the reasons stated herein, the undersigned cannot find that it is more

7       likely than not that no reasonable juror would have convicted petitioner in the light of the

8       statements in petitioner's declaration.

9              Petitioner's self-serving declaration that he did not shoot Herman does not constitute

10      sufficiently reliable evidence of his actual innocence.  Schlup, 513 U.S. at 332 (court assessing

11      actual innocence claim may consider "how the timing of the submission and the likely credibility

12      of the affiants bear on the probable reliability of [the new] evidence"); see also, e.g., Abara v.

13      Palmer, 2013 WL 1182108, *9 (D.Nev. Mar.19, 2013) (rejecting self-serving assertions as not

14      bearing highest indicia of reliability in assessing claims of actual innocence); White v. Yates,

15      2010 WL 7765579, *10 (C.D.Cal. July 12, 2010) (rejecting self-serving letter from petitioner as

16      not sufficiently reliable to make a credible claim of actual innocence), adopted, 2010 WL

17      7765598 (C.D.Cal. Aug. 24, 2010).

18             Other than his own declaration, petitioner has presented no direct evidence of his actual

19      innocence.  Petitioner has presented no evidence to support his claim that Marquis McAfee,or

20      anyone else, shot Herman.  While Herman may have been the only witness to the shooting,

21      petitioner is the only person with direct evidence of his alleged non-involvement in the shooting.

22      Because the evidence against petitioner, as discussed above, was strong, the undersigned does not

23      find that it is more than not likely that a reasonable juror would have chosen to believe petitioner

24      over Herman and the evidence supporting Herman's testimony.

25             In addition, several statements in petitioner's declaration are not consistent with the more

26      credible evidence presented at trial.  In his declaration, petitioner states that the first incident

27      happened during the afternoon.  However, credible evidence at trial indicated that the first

28      incident happened at around 9:00 p.m. and the shooting at 9:30 p.m.

1    In addition, while petitioner states that he never said anything about a gun, it is undisputed

2    (as evidenced by the testimony of Herman and Sabrina Herman as well statements in Byrd's

3    declaration) that one of the teenagers at Herman's house during the first incident said something

4    about a gun, with the evidence strongly indicating that it was petitioner.  Petitioner's failure to

5    address who made the statement regarding the gun undermines his credibility.

6    The undersigned also observes, as noted by respondent, that petitioner did not obtain the

7    declarations of Jaroon Lee, Jeffrey Fulmar, Janay or Desiree substantiating his whereabouts

8    during the time between the verbal altercation and shooting.  Instead, he obtained the conflicting

9    declarations of petitioner's three inebriated friends, none of whom could identify the shooter.

10   The declarations submitted by petitioner from Byrd, Thomas and Day do not corroborate

11   petitioner's claim that he was not the shooter.

12   Finally, the record demonstrates that petitioner had a motive to shoot Herman.  There is no

13   evidence that another person had a motive to shoot Herman.

14   For the reasons discussed above, petitioner's motion to testify at an evidentiary hearing is

15   denied.  In addition, the undersigned cannot find that it is more likely than not that no reasonable

16   juror would find petitioner guilty beyond a reasonable doubt had it heard petitioner testify.

17   Schlup, 513 U.S. at 324.

18   Witness Immunity

19   In the motion for witness immunity, petitioner requests that the court grant immunity to

20   Marquis McAfee so that he may testify at the evidentiary hearing.  In support of this motion,

21   petitioner states that on March 13, 2014, his present counsel and an investigator visited McAfee at

22   the California Department of Corrections Conservation Fire Camp # 45 in Santa Cruz, California.

23   McAfee has been in custody since December 2008.  During this visit, McAfee refused to talk

24   about the circumstances of petitioner's case even after petitioner's counsel told him that the

25   statute of limitations had likely expired.  The declaration of the Federal Defender's investigator

26   regarding his interview with McAfee states, in relevant part,

27          3.  On March 14, 2014, at approximately 10:45 a.m., I interviewed
              Marquis McAfee at the Bon Lomand Conservation Camp.  Federal
28            Defender Heather Williams and Assistant Federal Defender David

23

Porter were also present during McAfee's interview.

4. Prior to questioning McAfee, I introduced myself and explained briefly who Williams and Porter represented. Williams explained to McAfee the reason we were meeting with McAfee was Oscar Morales told us that McAfee was involved or knew who was involved in the Troy Herman shooting on January of 2006, that McAfee had a phone call with Morales after the shooting where McAfee said he had "Taken care of the situation and not to worry about the police because [Morales] would beat the charges."

5. McAfee stated Oscar, his cousin, spent that night at his house and he did not know why Morales was dragging his name into what occurred the night Herman was shot.

6. Williams then explained to McAfee that the statute of limitations on an attempted murder charge had expired and he should not worry about telling the truth about his involvement in the shooting.

7. McAfee asked us if Morales wanted him to lie about that night so Morales would not be in trouble any more. McAfee went on to say that he did not understand why we were asking him about what occurred the night Herman was shot in the back.

9. [the investigator's declaration omits a paragraph 8] I asked McAfee if he remembered the girl he used to date in 2006. McAfee stated he did not remember the girl. I advised him his girl's name was Janae, she drove a Toyota Rav4, and Janae had said something else about the night of the incident. McAfee stated Janae and him went all over the place in the Rav4 so he could not remember any specific night he was with Janae and Morales.

10. I then told McAfee his story about that night did not make any sense. I told him that several years ago he gave a statement to a public defender investigator about Morales spending the night at his house. I then read the statement to McAfee.

11. I asked McAfee why his story about the night Herman was shot did not match up with what Morales' family said occurred or what Morales told us. McAfee responded by saying Morales was his little cousin.

12. I asked McAfee why he gave Morales an alibi for the night Herman was shot in the back. McAfee stated again that Morales was his cousin. I asked McAfee what he meant, "Oscar, my cousin," when he responded to my questions as to giving Morales an alibi the night Herman was shot. McAfee then stated he did not want to talk anymore about the night Herman was shot.

13. I advised McAfee I had heard many stories about the night Herman was shot, that I wanted to hear from McAfee the truth about what happened. McAfee responded, "I do not want to say anything anymore."

14. I asked McAfee when the first time was that he heard Morales

was in trouble.  McAfee told me he heard about it the next day.  McAfee stated Morales's mom called him and told him.  I told McAfee I knew he was lying about when he found out.  I asked him again when he found out and McAfee stated he no longer wanted to talk about the incident anymore.

15.  I asked McAfee his relationship with Morales before the night Herman was shot.  McAfee stated he would speak and hangout with Morales about every other day.

16.  I asked McAfee how often he hung out or spoke with Morales after the night Herman was shot.  Morales stated he did not remember.  McAfee said that it was not unusual he stopped speaking to Morales after the night Herman was shot.  I asked him why he stopped talking to Morales.  McAfee stated he did not have a reason and he just stopped talking to Morales.

17.  I asked him again how his relationship with his cousin was.  McAfee stated Morales was his little cousin, he always looked out for him, and he wanted to help Morales anyway he could, but he would not lie for Morales.

18.  I told him some of the things he was telling me did not make sense and for him to tell me the truth about what happened the night Herman was shot, that I was getting the impression he did not want to help his cousin out.

19.  I then read the statements that he gave the public defender investigator on October 16 and October 18.  I told him the Morales family and Morales had a different story about what had occurred the night of the incident.  I also told him that I spoke to Jeffrey Fulmer and Jaronn Lee about the incident.

20.  I told McAfee that he wanted to help Morales, he should tell me what occurred the night Herman was shot.  McAfee stated he did not know all the stories people were saying about the night Herman was shot and he did not want to discuss the incident anymore.

21.  I told McAfee again it made no sense to me that, if he wanted to help his cousin out why he no longer wanted to talk about the night Herman was shot.  McAfee again stated he no longer wanted to talk about the night Herman was shot.

22.  McAfee talked several times throughout the interview that it was better being at the Fire Camp than at the prison at Susanville.  He also mentioned several times how he was able to get out in less than a year and he was looking forward to his release so he could take care of his children.

(ECF No. 46-2.)

It is undisputed that respondent will not give McAfee witness immunity for an evidentiary hearing.

25

1    As a general rule, "[a] criminal defendant is not entitled to compel the government to

2 grant immunity to a witness." United States v. Westerdahl, 945 F.2d 1083, 1086 (9th Cir. 1991).

3 However, under certain circumstances, immunity for defense witnesses might be "necessary to

4 protect and enforce a defendant's due process right to a fair trial." United States v. Lord, 711

5 F.2d 887, 892 (9th Cir. 1983). The Ninth Circuit has identified those circumstances:

6
> For a defendant to compel use immunity the defendant must show
7
> that: (1) the defense witness's testimony was relevant; and (2)
> either (a) the prosecution intentionally caused the defense witness
8
> to invoke the Fifth Amendment right against self-incrimination with
> the purpose of distorting the fact-finding process; or (b) the
9
> prosecution granted immunity to a government witness in order to
> obtain that witness's testimony, but denied immunity to a defense
10
> witness whose testimony would have directly contradicted that of
> the government witness, with the effect of so distorting the
11
> factfinding process that the defendant was denied his due process
> right to a fundamentally fair trial.

12

13 United States v. Straub, 538 F.3d 1147, 1162 (9th Cir. 2008); see also United States v. Wilkes,

14 744 F.3d 1101, 1104–09 (9th Cir. 2014) (applying Straub).[2]

15    *Relevance*

16    The relevance requirement is "minimal." Straub, 538 F.3d at 1157. "The defendant 'need

17 not show that the testimony sought was either clearly exculpatory or essential to the defense.'"

18 Id. (citations omitted). It is relevant, for example, if it raises credibility questions about a key

19 prosecution witness. Id.

20    Petitioner argues that McAfee's refusal to discuss with petitioner's investigator and

21 present counsel what happened on the night of the shooting renders relevant any testimony he

22 may give. In other words, petitioner argues that McAfee's refusal to discuss the night of the

23 _____

24 [2]  Petitioner's motion for witness immunity does not indicate whether he is requesting use or
transactional immunity for McAfee. Testimony obtained in use immunity may not be used to
prosecute the witness. Washington v. Driver, 2014 WL 1154067 at *2 (D. Alaska 2014).
25 Transactional immunity prohibits the prosecution for any offense about which the witness is
compelled to testify. (Id.) At oral argument, petitioner's counsel argued that McAfee should be
26 granted use immunity. The Ninth Circuit has applied the same test in considering claims for use
and transactional immunity. See U.S. v. Croft, 124 F.3d 1109, 1116 (9th Cir. 1997).
27

28

1    shooting suggests that he has relevant information.

2        For the reasons stated herein, the undersigned finds that petitioner has not demonstrated

3    that McAfee's testimony would be relevant.  According to petitioner's investigator, McAfee did

4    not admit being the shooter.  McAfee also asked if petitioner wanted McAfee to lie so that

5    petitioner would not be in trouble anymore.  McAfee made no statement to the investigator

6    suggesting that he had any relevant testimony.

7        During pretrial investigation, petitioner's trial counsel did not uncover any evidence of

8    McAfee's involvement in the shooting.  In a motion to exclude evidence of third party culpability,

9    the prosecutor discussed petitioner's third party defense claim, which did not point the finger at

10   Marquis McAfee:

11            In pretrial discussion and investigations, the defendant has denied
             his involvement in this attempted murder and offered many
12           different "theories" as to the identity of the perpetrator.  Several of
             these "theories" revolve around the defendant being in the presence
13           of a group of between six to eight black male juveniles
             approximately thirty to forty minutes prior to the shooting.  The
14           defense contends that the victim "falsely or recklessly accused the
             defendant of being the shooter" due to a history of animosity
15           between the victim and the Morales family and that the actual
             perpetrator was one of the black male juveniles present during the
16           exchange.

17           A. Marquis McAfee

18           Under one theory, the defense alleges that one or more members of
             the black male juveniles made good on their threat and returned
19           after the argument and shot the victim.  The defense had made
             attempts to identify the black male juveniles who were present
20           during the exchange with the victim.  Defense witness Marquis
             McAfee identified himself and JaRonn Lee as being present at the
21           verbal exchange between the victim and the group of juveniles on
             the day of the shooting.  The defense filed a Petitioner for
22           Disclosure of Juvenile Records pursuant to Welfare and Institutions
             Code section 827 seeking information about Marquis McAfee.  To
23           date, the People have been provided with one statement relating to
             Marquis McAfee.  The information contained within that statement
24           does not contain any information about Mr. McAfee's involvement
             in these crimes other than the fact he was present by his own
25           admission with the defendant during the verbal exchange with the
             victim.  The defendant fails to establish any direct or circumstantial
26           evidence to support that Marquis McAfee actually committed the
             crimes.
27
             B. JaRonn Lee and Anthony Michael King, Jr.
28

                                        27

As indicated above, Marquis McAfee identified JaRonn Lee as being present during the verbal exchange with the victim. The defense then went to the alleged "Myspace" webpage of JaRonn Lee which shows pictures of JaRonn Lee with someone identified as his brother. JaRonn Lee's "brother" is allegedly throwing a gang sign in the picture. The defense further alleges that the person in the photo with JaRonn Lee is Michael Anthony King, Jr. Both JaRonn Lee and Anthony Michael King, Jr. are black male juveniles. The defense was provided information by the People that Michael Anthony King Jr. has been validated as a blood gang member by the Sacramento Police Department. In addition, the defense asserts that Michael Anthony King Jr. gave the name of JaRonn Lee during an arrest and was subsequently charged with a violation of Penal Code section 148.9.

The defense filed a Petition for Disclosure of Juvenile Records pursuant to Welfare and Institutions Code section 827 seeking information about both JaRonn Lee and Anthony Michael King, Jr. To date, the People have not been presented with any statements or other discovery relating to JaRonn Lee or Michael Anthony King Jr. or any possible connection either of them may have to the case except that JaRonn Lee may have been present during the verbal exchange with the victim. The defendant fails to establish any direct or circumstantial evidence to support that JaRonn Lee or Anthony Michael King Jr. actually committed the crime.

C.  James Fulmer

An additional theory purported by the defense is that James Fulmer is a black male juvenile who was at the same address where the defendant encountered JaRonn Lee on the date of the shooting. According to the defense, James Fulmer's sibling had a intimate relationship with JaRonn Lee and admits knowing JaRonn Lee. The defense filed a Petition for Disclosure of Juvenile Records pursuant to Welfare and Institutions Code section 827 seeking information about James Fulmer. To date, the People have not been provided with any statements or other discovery relating to James Fulmer or any possible connection he may have with this case. Again, defendant fails to establish any direct or circumstantial evidence to support that James Fulmer actually committed the crime.

D.  Other Unknown Black Male Juveniles

According to the witnesses present during the verbal exchange between the groups of juveniles and the victim, there were between six to eight juveniles in the group. The People are unaware of the identity of any of these juveniles except the defendant. To date, the People have not received any statements or discovery, with the exception of the statement of Marquis McAfee, relating to the identity or the involvement of any of these male juveniles to the commission of these crimes. The defendant has failed to establish any direct or circumstantial evidence to support that any of the unknown black male juveniles actually committed the crime.

28

1 (CT at 1169-70.)

2      Eight years later, McAfee still does not admit any involvement in the shooting.  McAfee's

3 refusal to discuss what happened on that night of the shooting does not meet the relevance

4 requirement.  McAfee's question to the investigator asking if petitioner wanted him to lie about

5 what happened so that petitioner would not be in trouble is a denial of involvement.  Petitioner's

6 argument that McAfee might confess if given immunity is unsupported.

7      The undersigned also observes that the credible evidence does not support petitioner's

8 claim that McAfee shot Herman.  The evidence that petitioner shot Herman, as discussed above,

9 is strong.  In addition, based on the credible evidence regarding the timing of events, McAfee

10 could not have shot Herman based on petitioner's version of events.  As discussed above,

11 Herman, his daughter and ex-wife offered credible testimony that the shooting occurred

12 approximately 20-30 minutes after the first incident.  In his declaration, petitioner claims that

13 after the first incident, he and McAfee took the light rail from the Florin Station to downtown

14 where they "wandered around" for an unspecific amount of time.  Petitioner claims that McAfee

15 then called his girlfriend who drove them to petitioner's mom's house in the Florin

16 Road/Meadowview area.  Petitioner and McAfee's light rail ride, wandering around the

17 downtown mall and then riding to petitioner's mother's house clearly took longer than 20 to 30

18 minutes.  Based on petitioner's version of events, McAfee could not have shot Herman.

19      For all of the reasons set forth above, the undersigned finds that petitioner has not

20 demonstrated that McAfee has relevant testimony.

21      *Prosecutorial Misconduct*

22      The second prong of the witness immunity test "is that the prosecution refused to grant

23 witness use immunity with the deliberate intention of distorting the fact-finding process."  Id.,

24 quoting Williams, 384 F.3d at 600.[3]  "As of the first of the two alternative methods, the

25 _____

26 [3]  In his motion for witness immunity, petitioner cites Virgin Islands v. Smith, 615 F.2d 964 (3d Cir. 1980) for the standards for granting witness immunity.  In Straub, the Ninth Circuit discussed

27 the history of its case law regarding witness immunity, noting its adoption of the standards in Smith:

28      In Lord, our earliest case to develop a test for compelled use

defendant may satisfy this prong by showing 'that the prosecutor intentionally caused a defense witness to invoke the Fifth Amendment right against self- incrimination.'" Id., quoting Williams v. Woodford, 384 F.3d 567, 600 (9th Cir. 2004).  The government's actions "need to amount to something akin to prosecutorial misconduct." Id.

> Undue prosecutorial interference in a defense witness's decision to testify arises when the prosecution intimidates or harasses the witness to discourage the witness from testifying, for example, by threatening the witness with prosecution for perjury or other offenses.... The prosecution's conduct must amount to a substantial interference with the defense witness's free and unhampered determination to testify before the conduct violates the defendant's right to due process.

> immunity, we adopted the Third Circuit's rule that "'[t]he defendant must be prepared to show that the government's decisions were made with the deliberate intention of distorting the judicial fact [- ]finding process.'" 711 F.2d at 890 (quoting United States v. Herman, 589 F.2d 1191, 1204 (3d Cir. 1978)).  Lord also adopted the Third Circuit's subsequent developments of this rule, in Virgin Islands v. Smith, 615 F.2d 964 (3d Cir.1980).  As Lord describes Smith, the refined test was:

>> whether the federal prosecutor, in refusing to consent to extending immunity to the defense witness, acted with a deliberate intention of distorting the fact-finding process.... If the district court found that prosecutorial misconduct had prevented the defense witness from giving relevant testimony, then the court was directed to acquit the defendant unless the prosecutor granted use immunity to the defense witness.

> 711 F.2d at 891 (citations omitted). Thus, Lord required prosecutorial misconduct as an element of the test. However, Lord did not consider selective denial of immunity that was admittedly not prosecutorial misconduct but that had the alleged effect of distorting the fact-finding process. Lord only considered a claim under the other method of showing prosecutorial misconduct-intentionally causing a defendant to take the Fifth. The dispositive fact was that the defense witness "testified that before trial the prosecutor told him that whether he would be prosecuted depended on his testimony." Id. Lord remanded for "further clarification of the prosecutor's pre-trial comments" to the defense witness. Id.

U.S. v. Straub, 538 F.3d at 1158-59.

The Ninth Circuit's decision in Straub contains the standard for evaluating petitioner's motion for witness immunity.

Petitioner also cites several California state law cases in support of his motion for witness immunity.  Again, the undersigned finds that the Ninth Circuit's decision in Straub contains the relevant standard for evaluating petitioner's motion.

1   Williams v. Woodford, 384 F.3d at 601-02.

2          The alternative way that a defendant may satisfy the second prong of the immunity test is

3   by showing that "that the prosecution granted immunity to a government witness in order to

4   obtain that witness's testimony, but denied immunity to a defense witness whose testimony would

5   have directly contradicted that of the government witness." Williams, 384 F.3d at 600.

6          In the motion for witness immunity, petitioner does not argue that McAfee should be

7   granted immunity because the prosecution granted immunity to other prosecution witnesses.

8   Instead, petitioner argues that the government's failure to grant McAfee immunity distorts the

9   fact finding process.  Petitioner contends that the government has no valid reason not to grant

10  McAfee witness immunity because the statute of limitations has run and he cannot be prosecuted.

11  Petitioner admits that he is not aware of any prosecutorial misconduct leading McAfee to refuse

12  to testify.

13         The logical extension of petitioner's argument is that every defendant could challenge

14  their conviction by seeking witness immunity for someone willing to confess to the crime after

15  the statute of limitations had run.  The credibility of a witness granted immunity under these

16  circumstances is severely undermined.

17         However, in the opposition to petitioner's motion, respondent states that McAfee could

18  still be prosecuted for premeditated attempted murder.  Respondent states that the statute of

19  limitations for premeditated attempted murder has not run.  There is no limitation period for the

20  commencement of prosecution for a crime punishable by death or life imprisonment.  Cal. Penal

21  Code, §§ 799, 800.  The punishment for premeditated attempted murder is life in prison with the

22  possibility of parole.  Cal. Penal Code § 664(a).[4]

23          In the reply to respondent's opposition briefing, petitioner shifts gears and argues that the

24  state has now given the best reason for granting McAfee immunity, i.e., he could still be

---

25  [4]  Respondent also argues that it is possible that Herman could succumb to his injuries, making it
26  possible that a murder or manslaughter prosecution could be pursued.  The undersigned is less
    persuaded by this argument.  Respondent also argues that granting McAfee immunity would also
27  mean that if McAfee faced future unrelated allegations of committing a violent crime, granting
    him immunity would preclude respondent from introducing in that case McAfee's testimony here
28  that he was the shooter.

1  prosecuted.  Petitioner argues that the state has known since before trial of petitioner's plan or

2  desire to present evidence of a third party's culpability, and had knowledge that McAfee was the

3  likely suspect or had information about the actual shooter.

4         Respondent's desire to prosecute McAfee if he shot Herman is not an improper motive for

5  failing to grant immunity.  See Curtis v. Duval, 124 F.3d 1, 9–10 (1st Cir. 1997) (finding no

6  prosecutorial misconduct where "the prosecution's plausible assertion of a legitimate interest in

7  keeping the way clear for a possible future prosecution" of a defense witness is set forth);

8  Grochulski v. Henderson, 637 F.2d 50, 52–53 (2d Cir. 1980) (denying habeas corpus relief when

9  prosecutor declined to provide immunity to witness who was potential target of prosecution);

10  United States v. Mitchell, 886 F.2d 667, 669–70 (4th Cir. 1989) ("The government refused to

11  grant immunity to Williams because he was the subject of a criminal investigation, and we do not

12  think that this amounted to 'prosecutorial misconduct or overreaching.'").

13         Because the record shows no prosecutorial misconduct regarding the decision not to grant

14  McAfee use immunity, petitioner's motion for immunity should be denied.

15         *Fundamental Fairness*

16         Petitioner goes on to argue that "fundamental fairness" requires the court to grant McAfee

17  use immunity.  Petitioner quotes Straub, supra, in support of this claim:

18         Even where the government has not denied a defense witness
19         immunity for the very purpose of distorting the fact-finding
        process, the government may have stacked the deck against the
20         defendant in a way that has severely distorted the fact-finding
        process at trial. See Westerdahl, 945 F.2d at 1087 ("Previously, we
21         noted in dicta that where two eyewitnesses tell conflicting stories,
        and only the witness testifying for the government is granted
22         immunity, the defendant would be denied 'any semblance of a fair
        trial.'") (quoting Brutzman, 731 F.2d at 1452). In those cases where
23         the government has liberally used its discretion to grant immunity
        to numerous witnesses, and the defendant's witness could offer
24         relevant testimony that would directly contradict that of an
        immunized government witness, the trial may become so
25         fundamentally unfair that the defendant's due process rights are
        implicated.

26  Straub, 538 F.3d at 1160.

27         In Straub, the Ninth Circuit considered whether the selective denial of immunity that was

28  admittedly not prosecutorial misconduct but that had the alleged effect of distorting the fact-

                                              32

1   finding process could meet the second part of the prosecutorial misconduct test for use immunity.

2   The Ninth Circuit characterized this issue as the "purpose/effect" issue.  Id. at 1159.  In the

3   section of Straub quoted above, the Ninth Circuit discussed the purpose/effect issue as it applied

4   to the selective denial of immunity.  In other words, the Ninth Circuit was not carving out a

5   separate fundamental fairness exception for granting immunity.  Accordingly, to the extent

6   petitioner argues that there is a fundamental fairness exception for granting immunity, his

7   argument fails.

8           *Evidentiary Hearing Without Immunity*

9           During oral argument, petitioner's counsel indicated that they would be willing to call

10  McAfee as a witness at an evidentiary hearing even if he were not granted immunity.  After

11  considering this suggestion, the undersigned denies petitioner's request to call McAfee as a

12  witness without a grant of immunity.

13          As discussed above, in assessing whether an evidentiary hearing is warranted, the court

14  considers whether such a hearing "would produce evidence more reliable or more probative" with

15  regard to petitioner's assertion of actual innocence than the declarations before the court.  Griffin

16  v. Johnson, 350 F.3d 956, 966 (9th Cir. 2003).  Petitioner has presented no evidence

17  demonstrating that McAfee would testify regarding his involvement in the shooting or the

18  involvement of others in the shooting.  The undersigned is not persuaded by petitioner's argument

19  that McAfee might confess if he had to face petitioner in court during an evidentiary hearing.

20          The record indicates that that McAfee denies being involved in the shooting.  The

21  evidence that petitioner shot Herman his strong.  Other than his own self-serving declaration,

22  petitioner has presented no evidence that McAfee was involved in the shooting or knows if others

23  were involved.  For these reasons, the undersigned finds that having McAfee testify at an

24  evidentiary hearing, without a grant of immunity, would not produce evidence more reliable or

25  probative with regard to petitioner's assertion of actual innocence than the evidence before the

26  court.  Accordingly, petitioner's request to call McAfee as a witness at an evidentiary hearing,

27  without a grant of immunity, is denied.

28  ////

33

1    Accordingly, IT IS HEREBY ORDERED that petitioner's motion for a one day extension

2  of time to file his reply brief (ECF No. 66) is granted; and

3    IT IS HEREBY RECOMMENDED that petitioner's motions for an evidentiary hearing

4  (ECF No. 45) and witness immunity (ECF No. 46) be denied.

5    These findings and recommendations are submitted to the United States District Judge

6  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

7  after being served with these findings and recommendations, any party may file written

8  objections with the court and serve a copy on all parties.  Such a document should be captioned

9  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

10  objections shall be filed and served within fourteen days after service of the objections.  The

11  parties are advised that failure to file objections within the specified time may waive the right to

12  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13  Dated:  December 17, 2014

14

15  Mor544.157
                                    KENDALL J. NEWMAN
16                                  UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

34